**Entered on Docket
March 28, 2006
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA**



1  NOT FOR PUBLICATION

**Signed: March 28, 2006**

_____
**RANDALL J. NEWSOME
U.S. Bankruptcy Judge**
_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

In re David M. Davis,    )    Case No. 05-41180 RN7
                         )    Chapter 7
         Debtor.         )
                         )
_____)

**FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW**

This matter is before the Court upon the objection of the County of Alameda (herein "County") to the amended $150,000 homestead exemption claimed by David M. Davis (herein the "Debtor") pursuant to California Code of Civil Procedure §704.730(a)(3)(B) (herein the "Disability Homestead Exemption"). The Disability Homestead Exemption provides an increased exemption amount for persons with a physical or mental disability. The County does not dispute that the Debtor is entitled to a $75,000 homestead exemption, but asserts that he does not qualify for the enhanced $150,000 Disability Homestead Exemption. In accordance with Federal Rule of Civil Procedure 52, as incorporated by Federal Rule of Bankruptcy Procedure 7052, upon consideration of the record in this case and the testimony, evidence, and pleadings submitted to the Court at a February 6, 2006 evidentiary hearing, the Court hereby submits the following findings of fact, opinion, and conclusions of law.

**FINDINGS OF FACT**

**1.** On or about August 16, 2001, upon conclusion of a trial held in the Superior Court for Alameda County, a jury found, *inter alia*, that the Debtor and his company, Ace Recovery

Services (herein "Ace"), had defrauded the County as to certain accounts Ace collected on behalf of the County (herein the "Superior Court Judgment"). The jury awarded the County damages of more than $1 million. (*Superior Court Judgment*, Ex. A to Rapaport Decl., doc. 21). Subsequently, this Court found the debt represented by the Superior Court Judgment to be non-dischargeable in this bankruptcy case (*County of Alameda v. Davis (In re David M. Davis)*, Adv. Pro. 05-4281, *Judgment Entry*, doc. 25).

**2.** Some time during 2003, Leroy Guillory began to operate Accelerated Recovery Specialists, Inc. (herein "ARS"), a collection agency. Guillory is the owner of ARS. (Guillory Testimony, Recording of Feb. 6, 2006 Hearing at 2:12:45 - 2:16:00).

**3.** On or about November 20, 2003, the Debtor became employed at ARS. The Debtor was employed at ARS continually until January of 2006, including as of March 15, 2005, the date on which this bankruptcy case was filed. (Rec: 2:19:00 - 2:22:35).

**4.** For 2005, the Debtor received $8,400 in compensation from ARS, or $700 per month. (*2005 Form W-2 for David Davis*, County Ex. 2 for Feb. 6, 2006 Hearing; *Amended Schedule C*, doc. 26; Rec: 2:25:30 - 2:25:50).

**5.** In or about February of 2005, the Debtor began to receive monthly Supplemental Security Income disability payments (herein "SSI"). (*Debtor's Objection to County's Objection to Homestead Exemption*, doc. 18, at 4.) When the Debtor filed this case on March 15, 2005, he was receiving $497.50 in monthly SSI disability payments. The Debtor initially claimed a $125,000 homestead exemption on his residence located at 2913 Gilma Drive, in Richmond, California due to an asserted mental disability. The Debtor later amended his claimed homestead exemption to $150,000. (*Schedule C* attached to *Petition*, doc. 1 and *Amended Schedule C*, doc. 26).[1]

**6.** On August 31, 2005, the County filed an objection to the Debtor's amended claim of a $150,000 Disability Homestead Exemption. On February 6, 2006, this Court held an Evidentiary Hearing to determine the Debtor's eligibility to claim the Disability Homestead Exemption.

---

[1] Amendments to §704.730(a)(3) in 2003 increased the Disability Homestead Exemption from $125,000 to $150,000. *See*, Cal. Code Civ. Proc. §704.730, *Historical and Statutory Notes* (West 1987 & Supp. 2006).

# OPINION

## I. The Disability Homestead Exemption

The Disability Homestead Exemption provides for an increased homestead exemption of $150,000 if the debtor **1)** suffers from a physical or mental disability and **2)** as a result of that disability is unable to engage in "substantial gainful employment." For the Disability Homestead Exemption to apply, both of these conditions must have existed as of the date of the filing of the bankruptcy petition. Cal. Code Civ. Pro. §704.703(a)(3)(B); *In re Rolland*, 317 B.R. 402, 419 (Bankr. C.D. Cal. 2004); *In re Rostler*, 169 B.R. 408, 411 (Bankr. C.D. Cal. 1994).

If a debtor receives certain SSI payments, the Disability Homestead Exemption accords the debtor a rebuttable presumption that he is unable to engage in substantial gainful employment. (Cal. Code Civ. Pro. § 704.703(a)(3)(B)). Here, the parties do not dispute that the Debtor receives such monthly SSI disability payments, and that he is therefore accorded the presumption of an inability to engage in substantial gainful employment. (Rec: 2:09:30 - 2:10:45) As the objecting party, the County has the burden of proving that the Debtor is ineligible for the Disability Homestead Exemption. The ultimate burden of persuasion in this matter rests with the County. Fed. R. Bankr. Proc. 4003(c); *In re Rolland*, 317 B.R. at 413, 419; *Carter v. Anderson* (*In re Carter*), 182 F.3d 1027, 1029-30 n.3 (9th Cir. 1999). To rebut this presumption, the County must show that the Debtor was able to engage in substantial gainful employment as of March 15, 2005. *In re Rostler*, 169 B.R. at 412.

To engage in substantial gainful employment it must be shown that the Debtor **1)** performed a meaningful mental or physical work-related activity on a full or part-time basis; **2)** in a competitive or self-employed position; and **3)** which is the type of activity that normally results in pay or profit, whether or not a profit is realized. It is not necessary that the Debtor generate sufficient income for support to be considered gainfully employed, just that he was engaged in a business that normally results in pay or profit. *In re Rostler*, 169 B.R. at 413, *Carrao v. Shalala*, 20 F.3d 943, 946-47 (9th Cir. 1994). In assessing whether the presumption is rebutted, the Court may consider various factors, including the Debtor's work-related capabilities, the responsibilities and

3

skills required to perform the work, the amount of time the Debtor spends working, the quality of the Debtor's work, special working conditions, and for self-employed persons, the value of their work to the business. *Carrao v. Shalala*, 20 F.3d at 948; *In re Rostler*, 169 B.R. at 413.

**A. Performance of Meaningful Mental or Physical Work**

The initial inquiry is whether the Debtor performed meaningful mental or physical work, either full or part time. Here, as of the relevant March 15, 2005 petition filing date, Guillory testified that the Debtor spent 2 hours a day Monday through Friday at ARS, during which time the Debtor occasionally made photocopies in the office, took the mail out for delivery by dropping it in the mail box outside on the sidewalk, and performed errands such as getting lunch and coffee for Guillory. The Debtor performed poorly, which eventually lead to ARS terminating his employment. Guillory testified that in 2005 the Debtor created "havoc" at ARS, and sometime he would send the Debtor to a separate upstairs office, identified as Suite 1451. On at least one occasion, Guillory sent the Debtor to the bank, but because the Debtor did not return to ARS from the bank on that day, Guillory did not assign the Debtor that task again. Prior to March of 2005, Guillory no longer allowed the Debtor to make collection calls on delinquent accounts on behalf of ARS, because the Debtor was telling people how to *avoid* paying their bills. (Rec: 2:22:30 - 2:25:35; 2:31:13 - 2:32:21).

The menial nature of the Debtor's duties, the lack of regularity with which the Debtor successfully performed those duties, and the counter-productivity and difficulty the Debtor caused at ARS show that the Debtor's work at ARS throughout 2005 was not physically or mentally meaningful. Accordingly, the Court finds that the Debtor did not perform meaningful work for ARS at the time he filed the bankruptcy petition.

**B. Competitive or Self-Employed Position**

As to the second element of the inquiry, the Debtor must have been employed in either a competitive or self-employed position. Guillory has known the Debtor since 1998. (Rec: 2:18:00 - 2:18:15). Guillory testified that despite the Debtor's inability to perform he kept the Debtor at ARS in an attempt to help the Debtor and his child, because "he was a friend of mine" and that Guillory

4

"didn't want to see him [the Debtor] actually thrown out on the street." (Rec: 2:25:30 - 2:26:20). Guillory characterized the Debtor's presence at ARS as more "charity" than employment as he "wasn't mentally capable to do too much." (Rec: 2:22:00 -2:22:30). The Debtor's inability to successfully perform his job duties and the charitable nature of his having a position at ARS at all demonstrates that he held a position at ARS not because he was competitively better at his job than others, but rather because of his 7-year relationship with Guillory. Accordingly, this Court finds that the Debtor's position at ARS at the time of the filing of this bankruptcy case was not a competitive position.

As to the Debtor being self-employed, the Debtor did have access to the upstairs office at ARS, Suite 1451. The Debtor's testimony as to his use of Suite 1451 rambles at times, but ultimately shows that he did not use it for any business activities in 2005.

> Q: [Mr. Marquez] Now, Mr. Davis, during 2005 did you ever call anyone on behalf of ARS from Suite 1451?
>
> A: [Debtor] Did I call somebody in 1451?
>
> Q: Did you ever make any call, on behalf of ARS, from that Suite 1451, during 2005?
>
> A: To who?
>
> Q: To anyone, in connection with any work you were doing with ARS?
>
> A: I don't think so. I don't know. I mean, say it again?
>
> Q: My question, Mr. Davis, was, during 2005 did you ever make any phone calls to anyone as part of your duties with ARS, from Suite 1451?
>
> A: For David Ace? Or Ace Recovery Services?
>
> Q: I am referring to your employment with ARS.
>
> A: With Mr. Lee?
>
> Q: With Mr. Lee, during 2005, did you ever make any phone calls to anyone?
>
> A: Not to my knowledge. I don't remember making any. I made some phone calls to my sister, but Mr. Lee knows my sister, he let me call them. I got six sisters, and my brother sometime and my son, my nephews, my cousins.
>
> Q: Now Mr. Davis....

5

A: I didn't ask them for any money though.

(Davis Testimony, Recording of Feb. 6, 2006 Hearing at 3:07:40 - 3:09:35). The Debtor's use of Suite 1451 is not indicative of self-employment. As such, this Court finds that as of the filing date, the Debtor was not employed in either a competitive or self-employed position.

### C. Activity That Normally Results in Pay or Profit

As to whether the Debtor's work activities would normally result in pay or profit, regardless of whether he actually realized a profit, it is not disputed that the Debtor received or benefitted from monetary payments from ARS in 2005. ARS paid the Debtor gross wages of $700 per month, or $8,400 for all of 2005. (Rec: 2:25:30 - 2:26:10; County Ex. 2). In addition, during 2005 Guillory, through either ARS or his other company, Access Recovery Group, also paid the Debtor's monthly mortgage payment, automobile payment and insurance, home utility and tax bills, parking, and credit card bills. Guillory also paid for the Debtor's legal expenses. (Rec: 2:28:00 - 2:31:10; 2:32:30 - 2:44:00; County Exs. 3, 4 and 5).

As to the $700 ARS paid to the Debtor per month, Guillory testified this money was paid to the Debtor more for "charity" than for any services rendered to ARS. (Rec: 2:22:00 - 2:22:30). Additionally, as to payment of the Debtor's various other mortgage, automobile, and household expenses, Guillory testified that those were made pursuant to a loan agreement between Guillory and the Debtor.[2] (Rec: 2:41:00 - 2:44:00; County Ex. 8, *Loan Agreement*). Ultimately, the focus of this inquiry is not what the parties termed these particular payments, but whether the types of activities the Debtor engaged in at ARS would normally result in pay, regardless of whether he realized a profit. Thus, the Debtor's actual receipt of money, regardless of its characterization, offers little support for the proposition that the Debtor's activities are of the type that would normally yield actual pay or profit in a competitive or self-employed environment. The Debtor was not performing meaningful work at the time the petition was filed. To the contrary, he was acting against the best

---

2 As to Guillory's monthly payment of the mortgage on the Debtor's home, Guillory asserts some type of ownership interest in the Debtor's home, testifying that, "I'm paying *my* [Guillory's] mortgage. The way I look at it, as much money as I have invested into it, it's my home now, not his." (Rec: 2:28:25 - 2:29:00)

6

1 interests of his employer by advising others how to avoid paying their debts, was creating "havoc,"
2 and was being generally forgetful. Employers in a competitive enterprise do not pay for such
3 services. This Court thus finds that the Debtor's work activities at ARS are not of the type that
4 normally result in pay or profit.

### D. Rebuttal of the Presumption of Eligibility

The County has not provided evidence to rebut the presumption of the Debtor's eligibility to claim the Disability Homestead Exemption. The testimony of the County's own witness, Guillory, demonstrates that the responsibilities and skills required for the Debtor to perform his work were minimal at best. The Debtor had no regular duties or responsibilities. Additionally, the skills required of the Debtor to occasionally operate a photocopier, take the mail out to the sidewalk mailbox, or get Guillory's lunch are negligible. The Debtor spent 2 hours or so per business day at ARS, but there is no evidence that during the time spent there he was engaged in productive work.

Moreover, this Court's observation of the Debtor during his testimony at the February 6, 2006 Hearing leads this Court to conclude that the Debtor's ability to engage in productive work is severely limited. The Debtor's closing participation in the Hearing is illustrative.

> Q: [The Court] Ok, Mr. Davis, this your chance, if you've got anything - it has to be relevant to what we are talking about - but if you've got anything you want to say in your own defense regarding whether or not you were capable of substantial gainful employment, or were performing substantial gainful employment, as of March of 2005, if you've got something to say that concerns that, now is your chance.
>
> A: [Debtor] If you give me ... ah well I've got to talk to Mr. Lee and if, if you guys work out some sort of, I mean I don't mind trying to make payments or something. I can do that, but I never took no money from nobody, never, ever.
>
> Q: Ok, let me ask you a couple, I'm going to ask you a couple of questions, alright. Mr. Davis, when did you start hearing voices?
>
> A: Well, probably about two to three years ago, something like that, but I start . . .well I don't know if its just voices, I think it is the other side of me, and its trying to guide me in the right direction.
>
> Q: I see. Does the other side of you keep you awake at night sometimes?
>
> A: No, but when they send those talkin' papers to my house, and they keep me up all night.

| | | |
|---|---|---|
| 1 | Q: | The newspapers you mean? |
| 2 | A: | No ... the papers ... |
| 3 | Q: | Oh, I see. |
| 4-5 | A: | I go outside, and I keep finding who it is and nobody hear it but me ... and I know everybody is asleep, and I don't want to wake them up, but they make loud noises, right outside my window, yeah. |
| 6 | Q: | Papers? |
| 7-8 | A: | Yeah, the talkin' papers, but when he brought those papers to the house ... they call it umm ... they call it umm ... umm ... moving papers. |
| 9 | Q: | Oh, the moving papers. |
| 10 | A: | Something like that, but they're talkin' papers. |
| 11 | Q: | They talk to you? |
| 12-13 | A: | They make a lot of noise, and they keep you up.. . but then I haven't been able to get a good rest since they brought those papers to the house, even though I took them out of the house, but ... I don't know. |
| 14 | Q: | I don't have any questions. Do you have any questions based on my questions? |
| 15 | A: | [Mr. Marquez] Nothing further your Honor. |

The Court: Ok, then Mr. Davis you can step down.

(Rec: 3:20:18 - 3:22:45). Accordingly, this Court finds that the County failed to rebut the presumption, and as such further finds that the Debtor is entitled to the Disability Homestead Exemption.

## CONCLUSIONS OF LAW

In accordance with the foregoing, pursuant to §704.730(a)(3)(B) of the California Code of Civil Procedure, the Debtor is entitled to the $150,000 Disability Homestead Exemption.

**IT IS SO ORDERED.**

*** END OF ORDER ***

8

| | |
|---|---|
| 1 | COURT SERVICE LIST |
| 2 | David M. Davis |
| | 1611 Telegraph Ave. #1212 |
| 3 | Oakland, CA 94612 |
| 4 | Lois I. Brady |
| | P.O. Box 12754 |
| 5 | Oakland, CA 94604 |
| 6 | Harry Tom Miller |
| | Hassan Law Firm |
| 7 | 807 Montgomery St. |
| | San Francisco, CA 94133 |
| 8 | |
| | Leonard Marquez |
| 9 | Wendel, Rosen, Black and Dean |
| | 1111 Broadway 24th Fl. |
| 10 | Oakland, CA 94607-4036 |
| 11 | Office of the U.S. Trustee |
| | 1301 Clay St. #690N |
| 12 | Oakland, CA 94612 |

9